**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. No.: 3:16-cr-00684-MBS |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| | ) | |
| FREDERICK DEON GALLOWAY | ) | |
| | ) | |

## I. INTRODUCTION

A. <u>Factual Background</u>

On June 16, 2015, Mr. Jonathan Figueroa called 911 to report that his motorcycle was missing. ECF No. 56-1. Initially, the Sumter Police Department responded to the call. *Id*. at 2. Mr. Figueroa informed the police that his motorcycle had a tracking device attached to it that was manufactured by a private company, Find it Now USA, LLC ("FIN"). *Id*. At an evidentiary hearing, Mr. Figueroa testified that he gathered information by accessing his FIN phone app that provided the general location of where his motorcycle's GPS tracking device was located. Using the information obtained from FIN, Mr. Figueroa went to the general vicinity of 900 Salterstown Road to find the motorcycle on his own. ECF No. 57 at 2. Once he arrived, Mr. Figueroa contacted the Sumter Sheriff's Office and requested dispatch to 900 Salterstown Road. ECF No. 57-2. Deputies arrived on the scene minutes later. ECF No. 57 at 2.

Once on the scene, Investigators approached Defendant and asked for permission to search the property. ECF No. 57 at 2. Defendant refused consent to the search stating that the home was his girlfriend's property. *Id*.[1] Later, Sgt. Mays with the Sumter Sheriff's Office

---

[1] Defendant disputes making a statement to the police where he denied ownership of the home. ECF No. 63 at 7.

1

reported that he noticed a device that appeared to be the motorcycle's tracking device in the backyard of 900 Salterstown Road. ECF No. 57-3 at 1. Deputies composing the search warrant affidavit included Sgt. Mays' statement that he had located the tracking device in the backyard of the Salterstown property that they were requesting to search. *Id*. A search warrant was signed and approved by a South Carolina magistrate at 10:35 a.m. *Id*. As they conducted a search of the premises, law enforcement found additional items that they believed would be pertinent to their investigation but that were outside of the parameters of the original search warrant. At that time, law enforcement applied for another search warrant. ECF No. 56-8. A second search warrant was signed and approved by a South Carolina magistrate at 1:32 p.m. *Id*.

On September 5, 2016, Frederick Galloway ("Defendant") and his co-defendant, Tawania Galloway, were charged in a four-count indictment that charged Defendant with tampering with or altering vehicle identification numbers in violation of 18 U.S.C. § 511 (Count 1); operating, maintaining, and controlling a chop shop in violation of 18 U.S.C. § 2322(a)(1) and 2 (Count 2); obstructing, influencing, and impeding an official proceeding by soliciting and procuring a falsely sworn affidavit and witness statement in violation of 18 U.S.C. § 1512(c)(2) (Count 3); and, making a false entry in a sworn affidavit, a record, document and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a criminal investigation in violation of 18 U.S.C. § 1519 (Count 4). ECF No. 1.

B. <u>Motion to Suppress</u>

This matter is before the court on Defendant's motion to suppress filed February 1, 2017. ECF No. 56. The Government filed a response in opposition on February 9, 2017. ECF No. 57. Defendant filed a reply in support of the motion to suppress on February 16, 2017, and a supplemental reply on March 13, 2017. ECF Nos. 63 and 79.

Defendant contends that the evidence seized as a result of the June 16, 2015 search should be suppressed because search warrant affidavits mischaracterized and omitted information in violation of *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, Defendant argues that the motorcycle's GPS tracking device was not located on the property when law enforcement arrived on June 16, 2015. ECF No. 56 at 10. Defendant argues that the GPS was moved somewhere between 9:10 a.m. and 9:36 a.m., and that the device's change in location was either the result of law enforcement moving the device, or someone under law enforcement's direction moving the device. *Id*. Location logs indicate that the device was moved between 9:10 a.m. and 9:36 a.m. from approximately 890-892 Salters Street to 920-800 Salterstown Road. ECF No. 56-3 at 3.

Next, Defendant argues that the evidence should be suppressed because law enforcement engaged in a search of the property prior to obtaining a warrant. ECF No. 56 at 1-2. Defendant specifically draws attention to the property and evidence voucher that indicates that items were "seized" at 9:48 a.m., prior to the search warrant being signed at 10:35 a.m. ECF No. 56-7 at 6.

Finally, Defendant asserts that he has standing to seek suppression of the evidence derived from the searches despite the Government's argument that he lacked the requisite expectation of privacy. ECF No. 63 at 7. Defendant maintains that he did not deny ownership of the home, and that, even if he did not possess ownership of the home, the law makes clear that ownership or residency is not a prerequisite for standing to challenge a search under the Fourth Amendment. *Id*.

C. <u>Evidentiary Hearing</u>

The court held an evidentiary hearing on March 21, 2017, and a continued evidentiary hearing on April 7, 2017.

1. *Testimony of Mr. Banken*

Mr. Banken testified that he is an Operations Manager for FIN and that he has been working with the company for about nine years. He stated that he is familiar with the functioning of the company's tracking device because he helped to design it. Next, Mr. Banken explained the process by which customers are notified of movement of their property. First, he explained that, when the GPS is disconnected from the motorcycle's power source, the device begins to operate using its own battery. Next, the device sends the customer an automatic alert letting them know that the power has been disconnected. Such notifications can be sent by email or text, depending on the customer's preference. The automated alert informs the customer of the time the power was disconnected, and directs the customer to log into their account to see the particular address where the power disconnect occurred. Customers are given an approximate address that is based on "software conversions." Once logged into their personal accounts, customers are able to access google generated maps accompanied with the longitude and latitude coordinates of where the power disconnected for an accurate location description.

Mr. Banken testified that he received a call from Mr. Figueroa around 8:30 a.m. on the morning of June 16, 2015. Mr. Banken stated that he assumed that Mr. Figueroa slept through the alerts sent by FIN to notify him that his property had been moved earlier that morning. Next, Mr. Banken testified that Mr. Figueroa requested information concerning the location of his stolen motorcycle. Mr. Banken stated that he told Mr. Figueroa that the motorcycle's GPS tracking device was disconnected at 1:33 a.m. in the middle of the 900 Salterstown Road property.[2] Mr. Banken then testified that around 8:39 a.m. he sent Mr. Figueroa an email with

---

[2] Mr. Banken indicated that at the time of the disconnect, Mr. Figueroa should have received an automated alert that would have directed Mr. Figueroa to log into his account and access the longitude and latitude of the GPS tracking device's location at the time of disconnect. The

pictures of the location where the device last reported noting, "device reporting on the side of the road where the street line starts approximately 150' from corner of Salters St. and Holmes St." ECF No. 56-2 at 4.[3]

According to Mr. Banken's testimony, once Mr. Figueroa arrived at the location, Mr. Figueroa expressed that he did not see his motorcycle on or near the property. Mr. Banken then asked Mr. Figueroa to describe the property and the surrounding area. He asked Mr. Figueroa if there was a shed or trailer somewhere on the property and Mr. Figueroa indicated that there was a shed on the property. Mr. Banken then told Mr. Figueroa that the motorcycle was likely located in the shed on the 900 Salterstown property.

  2. *Testimony of Mr. Figueroa*

Mr. Figueroa testified that he woke up on the morning of June 16, 2015, looked outside, and noticed that his motorcycle was no longer parked in his parking spot. Next, he said, he called the police, and a few minutes later members of the Sumter Police Department arrived at his home. At that time, Mr. Figueroa said that he told the police officers the location of his motorcycle based on GPS tracking information he received from his FIN phone app. He stated that the police took an incident report and then left.[4] Once the police officers left, Mr. Figueroa

---

longitude and latitude of the GPS tracking device at 1:33 a.m., when it was disconnected from the power source, correlates to 900 Salterstown Road. Mr. Banken could not confirm that Mr. Figueroa accessed this information from the automated alert that he would have received, but testified that he orally gave the location information for the disconnect to Mr. Figueroa over the phone.

[3] The 8:39 a.m. email from Mr. Banken to Mr. Figueroa explains that the attached map shows where the device "last reported at 1:33 a.m." However, at the evidentiary hearing, Mr. Banken testified that the map instead shows where the motorcycle last reported at 1:55 a.m. *See* ECF No. 56-2 at 4. *See also*, ECF No. 63 at 3.

[4] The Sumter Police Department initially responded to Mr. Figueroa's call, and determined that the location given for the motorcycle was outside of their jurisdiction. As a result, the Sumter County Sheriff's Office took over the case. *See* ECF No. 56 at 2-3. *See also*, ECF No. 57 at 1.

headed in the direction of the location indicated in the FIN tracking app. He stated that the location listed in the app was an approximation, so he called FIN to get more accurate location information.

Once he arrived on the scene, Mr. Figueroa called the Sumter County Sheriff's Office. Soon after, the first officer to arrive on the scene, later identified as Investigator Bradley, made contact with Mr. Figueroa. Mr. Figueroa stated that he told Investigator Bradley that FIN indicated that his motorcycle's tracking device was somewhere near the 900 Salterstown Road property. Mr. Figueroa then testified that he and Investigator Bradley began walking along the dirt road behind the 900 Salterstown Road property, later identified as Salters Street, searching for the motorcycle. Next, Mr. Figueroa testified that Defendant came out of the home and walked toward the back fence where he and Investigator Bradley stood. Mr. Figueroa stated that Investigator Bradley and Defendant began to talk while at the back fence. First, Mr. Figueroa recalled Defendant telling Investigator Bradley that he may want to check the wooded area not far from the house as some of Defendant's young neighbors may be responsible. Next, Mr. Figueroa stated that Investigator Bradley asked Defendant for permission to look around the property. Mr. Figueroa recalled hearing Defendant decline consent for law enforcement to search the property stating that the property was his wife's home. When asked if Defendant appeared to live there, Mr. Figueroa testified that he could not tell whether Defendant lived at the property, but noted that Defendant came out of the home with a weed eater.

While continuing his search of the area near the Salterstown property, Mr. Figueroa testified that he found what he believed to be his motorcycle's GPS tracking device on the fence surrounding the backyard of 900 Salterstown Road. Mr. Figueroa stated that he was still on the phone with FIN when he picked up the tracking device. He said that Mr. Banken told him to

move around a few feet so that FIN could track the device. Mr. Banken also asked for Mr. Figueroa to describe the object that he found.

Mr. Figueroa explained that once he described the object, FIN confirmed that it was the GPS tracking device for his motorcycle. Mr. Figueroa stated that at this point, Investigator Bradley was in the backyard of 900 Salterstown Road speaking with Defendant. Mr. Figueroa testified that he notified Investigator Bradley that he had found something and that he began walking toward Investigator Bradley in the backyard. He then stated that Investigator Bradley asked how Mr. Figueroa knew it was the tracking device and that he informed Investigator Bradley that he spoke to FIN and that they indicated that it was the tracking device. Next, Mr. Figueroa testified that Investigator Bradley told him to "drop it." Mr. Figueroa complied with the officer's orders and dropped the tracking device where he stood, in the backyard of 900 Salterstown Road. Mr. Figueroa testified that he stayed around the premises for approximately five to six hours, spending most of the final hours in his car parked down the street from the property. Mr. Figueroa stated that once he was told to go home, law enforcement confirmed that they had found his motorcycle, but he was not able to identify the motorcycle until a few days later at the police station.

3. *Testimony of Investigator Bradley[5]*

Investigator Bradley testified that he reported to Salterstown Road after receiving a call from dispatch that a person was at the location due to a stolen motorcycle. He stated that he did not initially see Mr. Figueroa, but noticed him after he drove around the area a few times. Investigator Bradley then made contact with Mr. Figueroa and got brief information from Mr. Figueroa, who he testified told him that FIN indicated that his motorcycle's tracking device was

---

[5] At the time of the June 16, 2015 incident, Investigator Bradley was a patrol officer.

pinging in the area. Investigator Bradley stated that he and Mr. Figueroa paced around the area briefly before the Defendant approached the fence surrounding the backyard of 900 Salterstown Road. Investigator Bradley and Defendant began to talk, and Investigator Bradley testified that Defendant told him that he should look into a nearby wooded area for the motorcycle, because kids in the neighborhood frequent the wooded area. Investigator Bradley denied asking for consent to search the property, but stated that Defendant made it clear that no one could come onto the property and that the property was owned by his girlfriend. Investigator Bradley stated that he was following the directions given to him by his supervisor who told him to keep a parameter and await the investigations unit.

Investigator Bradley denied entering the backyard of 900 Salterstown Road until the search warrant was signed. Investigator Bradley further testified that, once Sgt. Mays reported to the scene, he briefed Sgt. Mays on what had occurred since his arrival earlier that morning. Additionally, Investigator Bradley testified that he never saw Mr. Figueroa with the tracking device. Investigator Bradley stated that he was the first to notice the tracking device in the backyard of 900 Salterstown Road near a grill. Finally, he stated that he pointed out the tracking device to Sgt. Mays who was now in charge of the scene.

### 4. *Testimony of Sgt. Mays*

Sgt. Mays testified that at approximately 9:00 a.m., he reported to the scene. He stated that, from his initial conversation with Investigator Bradley, he did not believe that the tracking device had been found. Sgt. Mays recalled that he later saw what he believed could be the tracking device near a grill on the property, for the first time. Sgt. Mays said that he did not inspect the tracking device at that time. Soon after, more law enforcement officers arrived on the

8

scene. According to Sgt. Mays, no one searched the home prior to obtaining a search warrant, and officers only entered the home to secure the premises, as is legally permissible.

Next, Sgt. Mays testified that he called the Sheriff's office to relay the information to a member of the staff so that a search warrant affidavit could be prepared. Included in the affidavit was Sgt. Mays' statement that he saw the tracking device in the backyard of the property located at 900 Salterstown Road.

## II. DISCUSSION

The Fourth Amendment to the United States Constitution provides that people and their effects cannot be subject to "unreasonable searches and seizures" and that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. All evidence obtained in violation of the Constitution is inadmissible. *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)(expanding the exclusionary rule enunciated in *Weeks v. United States*, 232 U.S. 383 (1914), to the state).

A. Standing

As a dispositive matter, the Government claims that Defendant does not have standing to bring a claim asserting a violation of his Fourth Amendment rights because he denied ownership of the home that was searched. ". . . [C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). "A legitimate expectation of privacy is both subjective and objective in nature: the defendant must show (1) he had a subjective expectation of not being discovered, and (2) the expectation is one that society recognizes as reasonable." *State v.*

9

*Missouri*, 603 S.E.2d 594, 596 (SC 2004). "Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Minnesota v. Olson*, 495 U.S. 91, 98 (1990)("We need go no further than to conclude, as we do, that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). *Id*. at 96.

The Government argues pursuant to *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980), suspects who deny ownership of property are unable to raise Fourth Amendment violations. However, the facts of *Rawlings* are not availing here. In *Rawlings*, the defendant challenged the search of an acquaintance's handbag that contained drugs that he asked the owner of the handbag to carry for him. *Id*. at 103. The court determined that the defendant did not have a reasonable expectation of privacy in the woman's handbag because, among other reasons: (1) he had only known the owner of the handbag for a few days, (2) he did not have any right to exclude other persons from access to the woman's purse, and (3) defendant admitted that he did not believe that the woman's purse would remain free from governmental intrusion. *Id*. at 104-05. The *Rawlings* court based its analysis on the decision made in *Rakas*, determining that *Rakas* established that the court's inquiry should be based on whether governmental officials violated any legitimate expectation of privacy held by petitioner. *Id*. at 106.

In *Rakas*, the Supreme Court declined to extend the definition of "legitimately on the premises" to apply to the defendants in that case who were raising Fourth Amendment violations from the search of a car in which they were merely passengers. However, the Court in *Rakas* did affirm the underlying understanding in *Jones v. United States*, 362 U.S. 257 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980), that an overnight guest, is someone that is more than just legitimately on the premises. *See Rakas* 439 U.S. at 141-42. *See*

*also*, *Olson*, 495 U.S. at 98. As the Court pointed out, "[e]xcept with respect to his friend, Jones had complete dominion and control over the apartment and could exclude others from it." *Rakas*, 439 U.S. at 149. Similarly, even if, as the Government contends, Defendant Galloway stated that the home was his girlfriend's home, he clearly had dominion over the home as he was allowed to stay in the home without his girlfriend's supervision or presence.[6] As a result, Defendant had a reasonable expectation of privacy on the premises that were searched. Although it is disputed whether Defendant stated that he did not own the home, Defendant's ownership is not required to establish a reasonable expectation of privacy. Therefore, Defendant has standing to bring his Fourth Amendment claims, and the court will analyze his substantive arguments accordingly.

B. Analysis under *Franks v. Delaware*

Defendant contends that law enforcement was aware that the tracking device was not originally found on the property of 900 Salterstown Road, and omitted or misstated facts when applying for the search warrant. ECF No. 56 at 6. Specifically, Defendant points to law enforcement's statements that Mr. Figueroa told them that the device was pinging at 900 Salterstown Road and that law enforcement found the device near a grill in the backyard of 900 Salterstown Road once they were on the scene. *Id*. at 7. In Defendant's view, the fact that the statement made to the magistrate to support the warrant affidavit did not include that the GPS was originally found somewhere outside of the Salterstown property is an intentional misstatement or omission. *Id*. at 11. Defendant argues that the tracking device was not located on the Salterstown property from 1:55 a.m. until law enforcement arrived and it does not appear

---

[6] The Government indicates that Defendant's girlfriend was not present at the time that law enforcement arrived on the premises, and that they were unable to reach her at a phone number provided by Defendant. ECF No. 57 at 2.

back on the Salterstown property until sometime between 9:10 a.m. and 9:36 a.m. ECF No. 63 at 6-7.

"Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the Defendant's request." *Franks v. Delaware*, 438 U.S. 154, 156 (1978). However, as *Franks* makes clear, a warrant issued based on an erroneous factual premise is "illegal" or "invalid" only if a government affiant made intentionally or recklessly false statements to obtain the warrant. Even then, if probable cause remains after the intentionally or recklessly false statements are stricken from the warrant affidavit, a defendant cannot obtain suppression of evidence as a result of the warrant. *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990).

The fact that a warrant is issued based on materially false statements does not necessarily mean that a search or seizure made pursuant to that warrant is unconstitutional. *See Franks v. Delaware*, 438 U.S. at 154, 164-65 (1978). The term "probable cause" itself contemplates that the beliefs giving rise to suspicion may eventually be found to be mistaken. However, when the probable cause supporting a warrant is based on deliberately false statements by a government affiant, or statements made in reckless disregard of the truth, a search or seizure pursuant to that warrant violates the Fourth Amendment. *Id.* at 156. Any evidence obtained as a result of such a search or seizure must be suppressed. *Id.* Although the Supreme Court had recognized a "good faith exception" to the exclusionary rule, this exception does not apply where the warrant violates *Franks*. *Colkley*, 899 F.2d at 300.

The Government argues that, because there were no falsehoods present in the search warrant affidavits, the evidence should not be suppressed. ECF No. 57 at 1. Mr. Figueroa testified that he found the tracking device on the fence surrounding the backyard of 900 Salterstown Road, picked up the tracking device, walked onto the property to show Investigator Bradley, and was subsequently told to drop the device where he stood. While there is conflicting testimony concerning whether Investigator Bradley told Mr. Figueroa to drop the device, there was no evidence to show that Sgt. Mays, the law enforcement officer who provided the information for the search warrant affidavit, ever knew that Mr. Figueroa found the device on the fence surrounding the backyard of 900 Salterstown Road. As a result, the absence of information in the warrant that details Mr. Figueroa finding the GPS on the fence, is not an intentional or reckless omission of the facts by Sgt. Mays. Sgt. Mays testified that he only relayed the facts that were given to him, and that he was never told that the GPS tracking device was found anywhere other than on the Salterstown property where he first noticed it.

Defendant failed to present any evidence to contradict Sgt. Mays' testimony to prove that law enforcement intentionally or recklessly omitted or misstated information in order to obtain the search warrant. In any event, even if there had been a misstatement or omission, evidence does not suggest that the misstatement or omission would have been material in that it would defeat probable cause. In the search warrant affidavit, law enforcement included the fact that Mr. Figueroa had informed them that the GPS tracking device was pinging on or near 900 Salterstown Road.[7]

---

[7] Testimony from Mr. Banken supports that, while on the phone with Mr. Figueroa, Mr. Banken informed Mr. Figueroa that the device disconnected at 1:33 a.m. in the middle of the 900 Salterstown Road property.

The Fourth Circuit directs that, "[g]reat deference is to be given a magistrate's assessment of the facts when making a determination of probable cause." *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992). A court's "inquiry is directed to whether the magistrate had a substantial basis for his conclusion that probable cause existed." *Id*. Here, the court finds that, the magistrate had enough information to make the conclusion that probable cause existed even without the statement that the GPS tracking device was found in the backyard of the property to be searched.

C. Legality of Search

Defendant argues that law enforcement violated the Fourth Amendment by executing a warrantless search of 900 Salterstown Road. To support this, Defendant points to the time stamps on the property and evidence voucher that state that items were seized at 9:48 a.m., well before the first search warrant was signed at 10:35 a.m. Further, Defendant avers, the search warrant returns state that law enforcement "searched (the person) described in the warrant and the (premises) at 9:20 a.m." ECF No. 56 at 7. *See also*, ECF Nos. 56-7 at 5-7.

The Fourth Amendment protects the right of the people against unreasonable searches and seizures and requires, with limited exceptions, that law enforcement obtain a search warrant, based on probable cause, before conducting a search. The Government argues that the 9:20 a.m. time stamp is not when the searches were performed but instead the time marked for when the Sheriff's Office opened the case. ECF No. 57 at 8. The Government points to FIN's internal records and notes that indicate that at approximately 10:00 a.m. the FIN employee had spoken with Sgt. Mays who indicated that law enforcement was waiting on the search warrant to get into the trailer. ECF 57-9 at 3. *See also*, 57-7 at 3. Defendant did not present any evidence to contradict the Government's theory regarding the time stamps.

Finally, evidence suggests that when the officers came across documents and property that they had not anticipated in their first search warrant affidavit, they submitted another search warrant application so that they could legally broaden their search efforts. All of this, taken together, supports the Government's position that no illegal warrantless search was executed on the property.

## III.   CONCLUSION

For the foregoing reasons, Defendant's motion to suppress is hereby **DENIED**.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina

May 4, 2017